J-A09021-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF VIRGINIA SEAY, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: DAVID EDMONSTON AND PETER EDMONSTON | |
| | No. 1871 MDA 2015 |

Appeal from the Order October 9, 2015
In the Court of Common Pleas of Clinton County
Orphans' Court at No(s): 18-2015-50

BEFORE: FORD ELLIOTT, P.J.E., JENKINS, J., and PLATT, J.[*]

MEMORANDUM BY JENKINS, J.:                    **FILED JUNE 20, 2016**

Appellants David Edmonston and Peter Edmonston appeal from an order entered in the Orphans' Court of Clinton County granting the petition for revocation of surviving spousal election filed by Robert Seay, the spouse of decedent Virginia Seay. We affirm.

Robert and Virginia Seay married on September 8, 1998, and remained married at the time of Virginia's death on February 21, 2015. On June 13, 2014, Virginia executed a will, without informing Robert. David and Peter Edmonston, Virginia's sons, were beneficiaries under the will and were to receive Virginia's personal property and the residuary of the estate.

---

[*] Retired Senior Judge assigned to the Superior Court.

Following Virginia's death, Robert signed a right of election against the will and conveyances. Shortly thereafter, Robert informed the Estate that he wished to revoke the election. On June 26, 2015, Robert filed a petition for revocation of surviving spouse's election. On July 7, 2015, Appellants filed a petition for injunction to freeze assets and to compel surrender of assets forfeited by Robert's right of election against the will and conveyances. The trial court conducted a hearing to address the petitions and the parties submitted supplemental briefs.

The trial court made the following findings of fact:

1. Robert [] resides at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania.

2. Robert [] has resided at said address since April of 1999.

3. Robert [] married Virginia[] in September of 1998 and they were married continuously from the marriage date until Virginia[']s death on February 21, 2015.

4. From the marriage date through Virginia[]'s death on February 21, 2015, Robert [] and Virginia [] resided jointly at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania.

5. The residence at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania was purchased jointly by Robert [] and Virginia [] on or about April 15, 1999.

6. Robert [] continues to reside at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania.

7. Robert [] is a retired Air Force Master Sergeant who made a career in the United States Air Force for approximately twenty (20) years.

8. Robert [] and Virginia [] began their relationship in June of 1996 and, as previously stated, were married on September 8, 1998.

9. The jointly owned property situate at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania, contained various items of household contents that were accumulated over the period of twenty (20) years including household contents that were originally owned by Robert [] and household contents that were originally owned by Virginia [].

10. During the course of the marriage, Robert [] and Virginia [] jointly owned bank accounts.

11. Virginia [] retained property in her own name located in Clearfield County, Pennsylvania.[1]

12. Virginia [] received dividends and royalties from the Clearfield County properties during the marriage.

13. Robert [] did not know the extent of Virginia[]'s Clearfield County holdings at the time of her death.

14. The jointly owned real estate, 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania, had a fair market value between $186,000.00 and $200.000.00 at the time of Virginia[]'s death.

15. At the time of Virginia[]'s death, Robert [] and Virginia [] possessed four (4) jointly owned bank accounts worth approximately $17,000.00 in total.

---

[1] Margaret L. Ake, Virginia's sister, testified that Virginia previously owned properties in Clearfield County, but that Ms. Ake assisted in transferring the properties in June of 2014. N.T., 9/1/2015, at 50-52. The assets were valued at $42,811.96, were transferred to Appellants for no consideration within one year of Virginia's death, and were transferred without Robert's knowledge. *Id.*; *see* 20 Pa.C.S. §2203(a) (surviving spouse has right to elective share of one-third of "[p]roperty conveyed by the decedent during the marriage and within one year of his death to the extent that the aggregate amount so conveyed to each donee exceeds $3,000, valued at the time of conveyance").

16. Robert [] understood that at the time of Virginia[]'s death, the jointly owned real estate would transfer in its entirety to the survivor.

17. Robert [] believed that the household contents would transfer to the survivor.

18. Near the end of her life, Virginia [] suffered from a brain tumor and was confined to a hospital bed at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania.

19. Until her death, Robert [] was Virginia[]'s primary caregiver.

20. At the time of Virginia[]'s death, and for some time thereafter, Robert [] was in poor physical and mental condition.

21. Robert [] was drinking excessively.

22. Robert [] was in a depressed state and pondered whether he should just "lay down and die right there".

23. During the final months and weeks of Virginia[]'s life, and as Robert [] was caring for her, Robert [] lost thirty-five (35) pounds because he was not eating.

24. Robert [] had a "worn" mental condition.

25. Following Virginia[]'s death on February 21, 2015, Robert [] was invited to meet with the Executors of the Virginia L. Seay Estate.

26. The meeting between Robert [] and the Executors occurred at the law office of Donald L. Faulkner, Esquire.

27. The meeting between Robert[,] the Executors and Attorney Faulkner was scheduled approximately three (3) weeks following the death of Virginia [].

28. The meeting was attended by Executors, William G. Ake and Margaret L. Ake, Donald L. Faulkner, Esquire, and his administrative assistant.

29. Margaret L. Ake is the surviving sister of Virginia [] and William G. Ake is the surviving brother-in-law of Virginia [] and is married to Co-Executor, Margaret L. Ake.

30. Robert [] was presented with various documents at the meeting.

31. Virginia [] died testate with a Last Will and Testament dated June 13, 2014.

32. A copy of the Last Will and Testament was presented to Robert [] at the initial meeting with the Executors and Attorney Faulkner.

33. Robert [] was not aware of the existence of Virginia[]'s Last Will and Testament dated June 13, 2014 until the meeting with the Executors and Attorney Faulkner.

34. At the time of the presentation of Virginia[]'s Last Will and Testament, Robert [] did not understand the meeting and sought the counsel of Robert H. Lugg, Esquire.

35. Following the meeting with Attorney Lugg, Robert [] believed that the real estate at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania, was his solely owned property.

36. Attorney Lugg prepared a document referenced as Letter/Spousal Election form, which Robert [] signed on April 10, 2015.

37. When Robert [] executed the Letter/Spousal Election form, he believed that the purpose of the document was to permit him to negotiate the return or retention of one hundred thirty-seven (137) items of personal property previously requested to be returned to the Estate by the Executors.

38. Robert [] was also making a claim against the Estate for the expenses he had incurred in connection with his deceased wife's illness, funeral and undertaker expenses and cremation expenses.

39. Robert [] believed that the Letter/Spousal Election form he signed disputed ownership of the one hundred thirty-seven (137) items of personal property that were requested by the Executors.

40. At the time Robert [] executed the Letter/Spousal Election form, he did not have an understanding of the

nature or value of his deceased wife's assets located in Clearfield County, Pennsylvania.

41. At the time Robert [] executed the Letter/Spousal Election form, he did not understand that the execution of the document could potentially be creating forfeitures of his interest in the real estate located at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania.

42. At the time Robert [] executed the Letter/Spousal Election form, he "thought the real estate was in stone."

43. At the time Robert [] executed the Letter/Spousal Election form, he did not have any appreciation that signing it would potentially cause him to forfeit interest in the jointly owned bank accounts.

44. At the time Robert [] executed the Letter/Spousal Election form, it was his understanding that he was only going to potentially have a claim to some of the one hundred thirty-seven (137) items of personal property that were being requested by the Executors.

45. Subsequent to executing the Letter/Spousal Election form, Robert [] became aware that the Spousal Election had implications beyond what he understood at the time of execution.

46. Subsequent to the execution of the Letter/Spousal Election form and between the dates of April 10, 2015 and April 16, 2015, Robert [] learned from his attorney, Robert H. Lugg, Esquire, that the Spousal Election had potential implications beyond Robert[]'s understanding as of April 10, 2015.

47. Upon learning that the Spousal Election could potentially cause forfeitures of portions of jointly owned property, Robert [] advised his attorney, Robert H. Lugg, Esquire, that he did not want to take any action that would potentially put the real estate located at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania, at risk.

48. Because Robert [], "jumped" on Attorney Lugg, Attorney Lugg prepared a Request to Withdraw the Election dated April 10, 2015, and forwarded the same to counsel for the Estate on or about April 16, 2015.

49. Robert [] desires to withdraw his Notice of Spousal Election dated April 10, 2015 and maintain sole ownership of the real estate located at 411 Guardlock Drive, Lock Haven, Clinton County, Pennsylvania.

50. Robert [] desires to withdraw his Notice of Spousal Election dated April 10, 2015 and maintain ownership of the jointly owned bank accounts.

51. Robert [] is willing to surrender any household contents that were owned by his deceased wife, Virginia [], at the time of her death and permit them to be distributed in accordance with Virginia[]'s Last Will and Testament.

52. Robert H. Lugg, Esquire, is a licensed attorney in the Commonwealth of Pennsylvania, with his practice located at 350 East Water Street, Lock Haven, Clinton County, Pennsylvania.

53. Robert H. Lugg, Esquire, has been in practice in Lock Haven, Pennsylvania, for approximately thirty (30) years.

54. At some point in the earlier part of 2015, Attorney Lugg provided legal representation to Robert[.]

55. Attorney Lugg did not have an attorney/client relationship with Robert [] prior to this meeting.

56. Robert [] made an appointment with Attorney Lugg to review a list of demands from the Executors of his deceased wife's Estate.

57. The Executors were requesting surrender of a considerable list of personal property that was located in the jointly owned residence at 411 Guardlock Drive, Lock Haven, Clinton County. Pennsylvania.

58. Robert [] desired to preserve some of the items of personal property that were contained on the list.

59. Attorney Lugg prepared a claim that listed three (3) different reasons why Robert [] should be permitted to retain at least some of the personal property that was included on the Executors' list.

60. In the same document, Attorney Lugg included a Spousal Election.

61. In addition to the Spousal Election, Attorney Lugg also claimed a Family Exemption and a Claim for Contribution of the Estate for payment of the funeral bill.

62. The Notice exercised in the Spousal Election requesting the Family Exemption and reimbursement, was contained in a document prepared by Robert H. Lugg, Esquire, dated April 10, 2015.

63. At the time of the Spousal Election on April 10, 2015, Attorney Lugg did not have any discussion with Robert [] concerning potential forfeiture consequences as a result of the filing of the Spousal Election.

64. Attorney Lugg was not personally aware of any potential claim against entireties property at the time he prepared the Spousal Election Notice for Robert[].

65. Attorney Lugg became aware, for the first time, that jointly owned property could possibly be forfeited as a result of the Spousal Election when he received a letter from Attorney Englert in response to the April 10, 2015 Spousal Election Notice.

66. Attorney Lugg received Attorney Englert's response on or about April 13, 2015.

67. Upon receipt of Attorney Englert's response. Attorney Lugg reviewed the applicable Statute and became aware that Robert[]'s Spousal Election had potentially placed jointly owned assets at risk of forfeiture.

68. Attorney Lugg attempted to confront the issue head-on and immediately contacted Robert [] and had Robert [] report to his office.

69. At the office meeting between Attorney Lugg and Robert[], Attorney Lugg advised Robert [] that the entireties assets may be in play.

70. Attorney Lugg provided Robert [] with a copy of the "law" to help him better understand what Attorney Lugg was explaining.

71. At the same meeting, Attorney Lugg provided Robert [] with a copy of Attorney Englert's letter.

72. This is the first time Attorney Lugg discussed with Robert [] the possibility of forfeiture as a result of the Spousal Election.

73. As a result of meeting with Robert[], Attorney Lugg left a voice message with Attorney Englert advising that Robert [] desired to withdraw the election against the Will he had previously made.

74. Attorney Lugg did not receive a response from Attorney Englert to the voice message.

75. Attorney Lugg prepared correspondence dated April 16, 2015, addressed to Attorney Englert, seeking permission on behalf of Robert [] to withdraw the Spousal Election.

76. The April 16, 2015 written request was placed in the Courthouse mailbox of Attorney Englert on the same date of the letter, April 16, 2015.

77. Attorney Lugg did not receive a response from Attorney Englert.

78. Attorney Lugg referred Robert [] to C. Edward S. Mitchell, Esquire, for independent representation regarding the withdrawal of the Spousal Election.

79. On June 26, 2015, Attorney Mitchell, on behalf of Robert[], surviving spouse of the decedent, Virginia[], filed a Petition for Revocation of Surviving Spouse's Election pursuant to Pennsylvania Orphans' Court Rule 12.3.

80. At the time the Spousal Election was made by Robert[], the Executors had not filed any form of accounting.

81. At the time the Spousal Election was made by Robert[], the Executors had not provided Robert [] with any informal type of accounting.

82. At the time the Spousal Election was made by Robert[], he did not have a full understanding of the assets and liabilities of the Estate.

83. Granting the petition of Robert [] will not result in any prejudice to the Estate.

J-A09021-16

Opinion, 10/9/2015.

On October 9, 2015, based on the above findings of fact, the trial court granted Robert's petition to revoke the spousal election and vacated his election to take against the will. On October 23, 2015, Appellants filed a timely notice of appeal. Appellants and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Appellants raise the following claims on appeal:

> 1. Whether the trial court erred in allowing [Robert] to revoke his spousal election due to a claim of ignorance of the law concerning the disclaimer of beneficial interests flowing from a spousal election set forth at 20 Pa.C.S. § 2204 where he hired independent counsel to represent him and file the election on his behalf and any ignorance or misapprehension of the law on his part was not due to any party interested in the estate?

> 2. Whether the trial court erred in relying upon "***Martin Estate***, 3 Pa. Fiduc. 2d 356, 357 (1983)" in a case involving a spousal election disclaimer of beneficial interest for the legal premise that "the executor of an estate owes a duty to the surviving spouse to disclose to him the value of the assets of the estate and the value which he would receive under the alternatives available to him" where neither the [Probate, Estates, and Fiduciaries] Code nor common law imposes such a duty.

Appellant's Brief at 4 (footnote removed).

This Court applies the following standard of review to orphans' court decisions:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses

- 10 -

and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*In re Estate of Fuller*, 87 A.3d 330, 333 (Pa.Super.2014) (quoting *In re Estate of Hooper*, 80 A.3d 815, 818 (Pa.Super.2013)).

Pursuant to Pennsylvania law,

**(a) Property subject to election.--**Except as provided in subsection (c), when a married person domiciled in this Commonwealth dies, his surviving spouse has a right to an elective share of one-third of the following property:

(1) Property passing from the decedent by will or intestacy.

(2) Income or use for the remaining life of the spouse of property conveyed by the decedent during the marriage to the extent that the decedent at the time of his death had the use of the property or an interest in or power to withdraw the income thereof.

(3) Property conveyed by the decedent during his lifetime to the extent that the decedent at the time of his death had a power to revoke the conveyance or to consume, invade or dispose of the principal for his own benefit.

(4) Property conveyed by the decedent during the marriage to himself and another or others with right of survivorship to the extent of any interest in the property that the decedent had the power at the time of his death unilaterally to convey absolutely or in fee.

(5) Survivorship rights conveyed to a beneficiary of an annuity contract to the extent it was purchased by the decedent during the marriage and the decedent was receiving annuity payments therefrom at the time of his death.

(6) Property conveyed by the decedent during the marriage and within one year of his death to the extent

- 11 -

that the aggregate amount so conveyed to each donee exceeds $3,000, valued at the time of conveyance.

In construing this subsection, a power in the decedent to withdraw income or principal, or a power in any person whose interest is not adverse to the decedent to distribute to or use for the benefit of the decedent any income or principal, shall be deemed to be a power in the decedent to withdraw so much of the income or principal as is subject to such power, even though such income or principal may be distributed only for support or other particular purpose or only in limited periodic amounts.

20 Pa.C.S. § 2203(a). A spouse invoking his or her right to the elective

share also disclaims interest in certain property.

**(a) Disclaimers.--**Except as provided in subsections (b) and (c), an election by a spouse to take his elective share shall be deemed a disclaimer of any beneficial interest of the spouse in the following, to the extent that such interest would otherwise be payable to or enjoyed by the spouse after the decedent's death:

(1) Property subject to the spouse's election not awarded to the spouse as part of his elective share.

(2) Property appointed by the decedent's exercise of a general or special power of appointment, and property passing in default of appointment to the extent that the decedent had power to exclude his spouse from any interest therein.

(3) Property in any trust created by the decedent during his lifetime.

(4) Proceeds of insurance, including accidental death benefits, on the life of the decedent attributable to premiums paid by him, his employer, partner or creditor.

(5) Any annuity contract purchased by the decedent, his employer, partner or creditor.

(6) Any pension, profit sharing, stock bonus, deferred compensation, disability, death benefit or other plan established by an employer for the benefit of its employees

and their beneficiaries, exclusive of the Federal social security system and railroad retirement system, by reason of services performed or disabilities incurred by the decedent.

(7) Community property in the proportion that it represents the decedent's earnings or contributions.

(8) All intangible or tangible personal property and all real property owned by the decedent and his spouse by the entireties or jointly with right of survivorship, in the proportion that such property represents contributions by the decedent.

(9) All intangible or tangible personal property and all real property given to his spouse by the decedent during his lifetime which, or the proceeds of which, are still owned by his spouse at the time of the decedent's death.

20 Pa.C.S. § 2204.

The Supreme Court of Pennsylvania has stated:

The general rule is that the party is not bound to make an election until all the circumstances are known, and the state, condition and value of the funds are clearly ascertained; for until that is known it is impossible to make a discriminating and deliberate choice, such as ought to be binding in reason and justice[.]  To bind the widow she must have full knowledge of the facts[.]  As a general rule a receipt for part of a legacy will not bar dower without a full knowledge of the situation of the estate[.]  Our own books are to the same effect.  The election must be evidenced by plain and unequivocal acts, with full knowledge of the situation of the estate[.]

***Appeal of Kreiser***, 69 Pa. 194, 200-01 (1871) (citations omitted).  The

Supreme Court has further stated:

If an election is made with full knowledge of all essential facts, it cannot be withdrawn.  But, no intervening rights appearing, the expression of intent once may be retracted upon discovery of the true situation.  If action has been taken by the wife or husband in ignorance of the value of

the estate, or of the rights which would accrue under the provisions of the will as compared with the interests given by the intestate laws, then the first election may be set aside, and the distribution be made in the way provided by law.

***McCutcheon's Estate***, 128 A. 843, 845 (Pa.1925) (citations omitted).

In ***Bailey's Estate***, 132 A. 343 (Pa.1926), the Supreme Court of Pennsylvania did not permit a spouse to revoke her election 10 months after the election was filed. The spouse admitted that "at the time [she] made her election, she was aware of the terms of her husband's will that, if she took against its provisions, she would receive one-third of the estate, knew approximately the amount and value of the property, and that, if knowledge of these facts was sufficient to bind her, she was bound by her election." ***In re Bailey's Estate***, 132 A. at 343. She claimed she should be permitted to revoke the election because, at the time she made the election, she believed that, by making the election, it would disrupt her husband's will as to all provisions, and it would be as though he died intestate. ***Id.*** The Court noted that this misapprehension had to do with the interests of others, not her interest. ***Id.*** at 344. The Court concluded "the intention of the legislation was to promote certainty in settlement of estates, [and] we would fail to carry out the spirit of the act by permitting a revocation of an election a long time after it has been made, with full knowledge of all the facts, and for reasons such as are given in the present case." ***Id.***

The trial court did not err in permitting Robert to revoke his election. Unlike the spouse in ***Bailey's Estate***, Robert did not know the value of the

estate. At the time of the election, no accounting had been filed and Robert did not know the value of the property owned by Virginia in Clearfield County. Further, Robert informed the estate that he would like to revoke the election six days after making the election. Although he had counsel, he also had a misapprehension of his rights, did not know the value of the estate, and did not know the value of the property to which he would be entitled if he elected against the will.

Appellants next challenge the trial court's statement that the executor of an estate owes a duty to the surviving spouse to disclose the value of the assets of the estate and the value which he would receive under the alternatives available to him. Opinion and Order, 10/9/2015, at 12.

Robert did not have full knowledge of his rights and of the value of the estate property. Because we find the trial court did not err in allowing him to revoke the election based on this lack of knowledge, we do not reach the issue of whether the executor had a duty to inform Robert of the value his share under each alternative available.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/20/2016

- 15 -